# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALEXANDRA LAUREN CHILTON,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

Defendant.

No. 12 C 6692

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Alexandra Lauren Chilton filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 12, 2009, alleging that she became disabled on August 21, 2002, because of epilepsy. (R. at 23, 192, 196). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 23, 94, 95, 109-10). On February 28, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (R. at 23, 38–93). The ALJ also heard testimony from Ashok G. Jilhewar, M.D., a medical expert (ME), and Jill K. Radke, a vocational expert (VE). (*Id.*). At the hearing, Plaintiff amended her alleged onset date to November 1, 2008. (*Id.* at 41).

The ALJ denied Plaintiff's request for benefits on April 19, 2011. (R. at 23–30). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity from her alleged onset date through June 30, 2010, her date last insured.[3] (*Id.* at 25). At step two, the ALJ found that Plaintiff's seizure disorder is a severe impairment. (*Id.* at 25–26). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 26).

---

[3] The ALJ determined that Plaintiff last met the Act's insured status requirements on June 30, 2010. (R. at 25). "In order to be entitled to **DIB**, an individual must establish that the disability arose while he or she was insured for benefits." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 348 (7th Cir. 2005). Therefore, in order to recover for benefits, Plaintiff must establish that she was disabled prior to June 30, 2010. *See Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [plaintiff] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that she has the RFC to "perform light work as defined in 20 C.F.R. § 404.1567(b) except she should not be exposed to hazards like dangerous moving machinery or unprotected heights." (R. at 26). At step four, based on Plaintiff's RFC and the VE's testimony, the ALJ determined that Plaintiff was capable of performing past relevant work as a bank teller. (*Id.* at 29). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.*).

The Appeals Council denied Plaintiff's request for review on June 23, 2012. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Plaintiff has a history of epilepsy since age 14. (R. at 434). She began treating with Thomas H. Burnstine, M.D., a neurologist, in April 2004, when she was 16 years old. (*Id.* at 68, 144, 296). On April 16, 2004, Plaintiff reported six seizures over the prior 18 months, one of which occurred during a period of noncompliance with her medications. (*Id.* at 296). At the time, Plaintiff was taking Trileptal 300mg

twice daily to control her seizures.[5] (*Id.*). Plaintiff also reported a history of anxiety/panic attacks. (*Id.*). Her physical examination was unremarkable. (*Id.*). Dr. Burnstine diagnosed a generalized seizure disorder, along with panic attacks and anxiety. (*Id.*). He increased her Trileptal dosage to 450mg, twice daily. (*Id.* at 297).

On April 30 through May 3, 2004, a 72-hour Ambulatory/Computer Monitored EEG Recording with Video was performed. (R. at 298–99). Dr. Burnstine found the results "moderately abnormal" "due to the presence of electrographic, clinically correlated seizure activity consistent with a primary generalized seizure disorder." (*Id.* at 299).

On May 13, 2004, Plaintiff reported no side effects from her seizure medication and fewer events. (R. at 291–92). Dr. Burnstine increased her Trileptal dosage to 600mg, twice daily. (*Id.*). On July 23, 2004, Plaintiff reported no seizures with the increased Trileptal dosage. (*Id.* at 289–90). She still had some early morning myoclonus,[6] occurring once every two weeks, where she had fallen and dropped glassware. (*Id.*). Dr. Burnstine added Topamax 25mg at bedtime to control the myoclonus.[7] (*Id.*). On September 24, 2004, he increased the Topamax dosage to 50mg. (*Id.* at 288). On December 14, 2005, and November 1, 2006, Plaintiff reported being sei-

---

[5] Oxcarbazepine (brand name Trileptal) "is an anticonvulsant and mood-stabilizing drug, used primarily in the treatment of epilepsy." <en.wikipedia.org/wiki/Oxcarbazepine>

[6] Myoclonus is a "spasm or twitching of a muscle or group of muscles." *Stedman's Medical Dictionary* 919 (5th ed. 1982).

[7] Topiramate (brand name Topamax) is an anticonvulsant (anti-epilepsy) drug. <en.wikipedia.org/wiki/Topiramate>

zure free since June 25, 2005. (*Id.* at 286–87). Dr. Burnstine continued her medications. (*Id.* at 286).

On October 14 and November 2, 2006, Plaintiff went to the emergency room complaining of chronic seizures. (R. at 353, 358). A physical examination was unremarkable. (*Id.* at 359).

On December 11, 2008, Plaintiff presented to the emergency room complaining of shakiness. (R. at 437). After taking her seizure medications, the feeling of shakiness disappeared. (*Id.*). She denied having a seizure or losing consciousness. (*Id.*). She reported only one seizure in the last several years, in April 2008. (*Id.*). A physical examination was unremarkable. (*Id.*).

On July 3, 2009, Plaintiff went to the emergency room, complaining of chest pain. (R. at 330–33). She felt shaky, like she was going to have a seizure. (*Id.* at 330). No symptoms were noted by the ER physicians. (*Id.*). A physical examination was unremarkable. (*Id.* at 331). Plaintiff was diagnosed with atypical chest pain and seizure and discharged. (*Id.* at 332).

On July 15, 2009, Dr. Burnstine informed the Commissioner that he had not seen Plaintiff in over a year and she had not been refilling her medications. (R. at 320). The Commissioner ordered tests to check Plaintiff's topiramate and oxcarbazepine levels. (*Id.*). Thereafter, blood tests indicated that her medications were within normal range. (*Id.* at 308; *see id.* at 314).

On August 15, 2009, Peter Biale, M.D., completed an internal medicine consultative examination on behalf of the Commissioner. (R. at 304–07). Plaintiff reported having grand mal type seizures weekly: five in July and one so far in August. (*Id.* at 304). The seizures lasted five minutes and were accompanied by postictal symptoms. (*Id.*). Plaintiff stated that she takes Trileptal and Topamax to control her seizures. (*Id.*). A physical examination was unremarkable. (*Id.* at 305). Plaintiff's immediate and remote memory were intact, and her recent memory good. (*Id.* at 306). Dr. Biale diagnosed seizure disorder, noting that Plaintiff was Romberg positive[8] and she had reported a history of falling due to seizures. (*Id.* at 307).

On August 20, 2009, Plaintiff had a seizure while driving and was taken to the emergency room. (R. at 365). She admitted drinking in excess the prior night and may have missed her night dosage. (*Id.*). She stated that her seizures occur every few weeks. (*Id.*). A physical examination was unremarkable. (*Id.* at 366). Plaintiff refused to have diagnostic laboratory tests performed. (*Id.*). The attending physician diagnosed grand mal status epilepticus seizures. (*Id.*).

On August 24, 2009, Francis Vincent, M.D., a DDS consultant, prepared a physical RFC assessment. (R. at 310–17). He opined that Plaintiff should never climb ladders, ropes, or scaffolds, and should avoid machinery and heights because of her seizure disorder. (*Id.* at 312, 314). Dr. Vincent found Plaintiff's statements regarding epilepsy only partially credible because she was not currently being treated and

---

[8] "The Romberg test is used to investigate the cause of loss of motor coordination (ataxia). A positive Romberg test suggests that the ataxia is sensory in nature, that is, depending on loss of proprioception." <en.wikipedia.org/wiki/Romberg's_test>

had not seen Dr. Burnstine in over a year. (*Id.* at 315, 317). On June 3, 2010, Barry Free, M.D, a DDS consultant, affirmed Dr. Vincent's opinion. (*Id.* at 301–03).

On September 21, 2009, Plaintiff went to the emergency room, complaining that she felt like she was going to have a seizure. (R. at 371). Symptoms disappeared and a physical examination was unremarkable. (*Id.* at 371–72). Plaintiff asserted that she was compliant with her medications. (*Id.* at 371). The attending physician diagnosed chronic seizures. (*Id.* at 372).

On November 13, 2009, Plaintiff presented to the emergency room after a sudden fall to the ground. (R. at 377). After her fall, Plaintiff was confused and amnesiac. (*Id.*). She admitted not taking her seizure medications that day. (*Id.*). A neurological examination found positive headache, positive altered mental status, negative numbness, positive confusion, and positive dizziness. (*Id.*) All other examination results were unremarkable. (*Id.* at 377–78). A CT scan of Plaintiff's brain was normal. (*Id.* at 381). The attending physician diagnosed a single isolated seizure. (*Id.* at 377, 379). On November 24, 2009, Dr. Burnstine opined that Plaintiff's fall was actually a panic attack, rather than a seizure. (*Id.* at 401).

On December 9, 2009, an MRI of Plaintiff's brain and an 18-channel EEG with one added channel of EKG rhythm activity were normal. (R. at 399–400).

On February 17, 2010, Plaintiff presented to Dr. Burnstine. (R. at 396–98). She reported that her seizures and anxiety/panic disorder were well controlled. (*Id.* at 396). A physical examination was unremarkable. (*Id.*). Dr. Burnstine continued her medications. (*Id.*). On the same day, he completed a medical report for the Illinois

Secretary of State. (*Id.* at 397–98). He opined that Plaintiff could safely operate a motor vehicle, stating that her seizure and mental disorders were successfully controlled with medications, without any attacks of unconsciousness over the previous six months. (*Id.*).

On April 23, 2010, Gregory C. Rudolph, Ph.D., a licensed clinical psychologist, performed a psychological examination on behalf of the Commissioner. (R. at 406–09). Plaintiff reported having grand mal seizures but being in remission. (*Id.* at 406). Her seizures do not occur frequently—her last seizure was in August 2009. (*Id.* at 407). Plaintiff reported being hospitalized for one month for self-mutilation behavior. (*Id.*). She has anxiety with panic attacks, for which she takes Xanax, 1mg daily. (*Id.* at 408). Dr. Rudolph found Plaintiff coherent with relevant thoughts. (*Id.*). Her mood was upbeat, no evidence of depression or hostility, affect appropriate, and no unusual thought disturbances noted. (*Id.*). Dr. Rudolph found Plaintiff oriented to reality, intact memory, adequate knowledge of information, able to make calculations, and to use judgment and reasoning skills. (*Id.*). He diagnosed anxiety disorder, history of learning disorder, and ADHD in remission. (*Id.* at 406).

On May 27, 2010, Kirk Boyenga, Ph.D., a DDS consultant, completed a Psychiatric Review Technique report. (R. at 411–23). He opined that Plaintiff was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (*Id.* at 421). He found Plaintiff partially credible and able to perform activities of daily living and simple work-related activities. (*Id.* at 423).

Plaintiff was admitted to the hospital on July 12, 2010, after she slipped in the shower and fell and hit her head. (R. at 434). Plaintiff reported losing consciousness for 30 minutes, after which she started having 11 episodes suspicious for seizures.[9] (*Id.*). The emergency room doctors observed multiple seizures that consisted of Plaintiff' clenching her hand and her eyes rolling back. (*Id.* at 439). Nevertheless, because she responded to stimulation, the ER physician opined that they were most likely pseudoseizures.[10] (*Id.* at 439, 454). No postictal confusion was noted. (*Id.* at 439). Plaintiff informed the attending physician that she has been noncompliant with her seizure medications. (*Id.*). She reported being seizure-free since August 2009. (*Id.*). Plaintiff denied any major history of anxiety, depression, or suicidal or homicidal ideations. (*Id.* at 440). A physical examination was unremarkable. (*Id.*).

The attending physician spoke with Dr. Burnstine to confirm the exact dosage of her antiseizure medications. (R. at 455). Dr. Burnstine reported that although he had never witnessed any seizure activity, based on reports from family members and previous ER stays, "he is pretty confident that she has a seizure disorder." (*Id.*; *see id.* at 457). The attending physician advised Plaintiff to follow-up promptly with Dr. Burnstine. (*Id.* at 455).

---

[9] Plaintiff acknowledged to one doctor that she did not think they were seizures because she usually has a bad taste in her mouth before her seizures. (R. at 456).

[10] Pseudoseizures, more commonly known as psychogenic non-epileptic seizures (PNES) or as non-epileptic attack disorders (NEAD), "are events superficially resembling an epileptic seizure, but without the characteristic electrical discharges associated with epilepsy. Thus, PNES are regarded as psychological in origin, and may be thought of as similar to conversion disorder." <en.wikipedia.org/wiki/Psychogenic_non-epileptic_seizures>

During her hospital stay, she consulted with Leonid Bouinyi, M.D. (R. at 434). Plaintiff's antiseizure medications included Trileptal 300mg and Topamax 50mg, each taken once daily. (*Id.*). The dosages had been recently reduced by Dr. Burnstine "because he thought she was getting too much medication." (*Id.*). Dr. Bouinyi found these dosages "unusual" because they are quite small and taken only once a day. (*Id.*). "Both of these medications' half life is less than 24 hours and it should be used at least twice daily." (*Id.*). A head CT and EEG were normal. (*Id.* at 435). During the middle of the evaluation, Dr. Bouinyi observed that Plaintiff was sleepy, but easily arousable. (*Id.*). Dr. Bouinyi opined that Plaintiff's episodes were "likely to be nonepileptic spells. The patient probably does have history of epilepsy, but current presentation argues against true epileptic seizures." (*Id.* at 435–36). Dr. Bouinyi recommended that Plaintiff follow-up with Dr. Burnstine for a possible adjustment in her medications. (*Id.* at 436). A July 14, 2010 EEG was normal. (*Id.* at 451).

On July 23, 2010, Dr. Burnstine completed a Seizures RFC Questionnaire. (R. at 429–32). He diagnosed generalized tonic clonic seizures, occurring several times a month.[11] (*Id.* at 429). He stated that Plaintiff suffers side effects from her medication, including dizziness, lethargy, lack of alertness, and impaired concentration. (*Id.* at 430). Dr. Burnstine opined that Plaintiff seizures would likely disrupt the work of co-workers, and she would need more supervision than an unimpaired worker. (*Id.*). He concluded that Plaintiff was capable of low stress jobs but would

---

[11] "Tonic–clonic seizures (formerly known as grand mal seizures) are a type of generalized seizure that affects the entire brain. Tonic–clonic seizures are the seizure type most commonly associated with epilepsy and seizures in general . . . ." <en.wikipedia.org/wiki/Tonic-clonic_seizure>

need to take unscheduled breaks during the workday and would likely miss four days per month. (*Id.* at 432).

On August 8, 2010, Plaintiff presented to the emergency room with chronic seizures. (R. at 478). In the examination room, she did not know her name or other personal information. (*Id.*). On examination, Plaintiff's level of consciousness was altered; she was disoriented to person, place, and time. (*Id.* at 481). Seizure activity was noted, less than 30 seconds in duration, with minimal postictal somnolence but continued confusion. (*Id.*). On discharge, she was diagnosed with seizure, altered mental status, head contusion, and dehydration. (*Id.* at 480).

On February 11, 2011, Plaintiff presented to Dr. Burnstine complaining of chronic seizures. (R. at 497–98). She reported two to three grand mall seizures per week, along with several pseudoseizures per week. (*Id.* at 497). Dr. Burnstine's examination was unremarkable. (*Id.* at 498). He diagnosed focal seizures with secondary generalization. (*Id.* at 497). Dr. Burnstine continued Plaintiff on Alprazolam 0.25mg nightly, Topamax 50mg nightly, and Trileptal 600mg twice daily, and ordered a 72-hour ambulatory EEG. (*Id.*).

On the same date, Dr. Burnstine completed a second Seizures RFC Questionnaire. (R. at 486–89). He stated that Plaintiff has generalized clonic-tonic seizures, with loss of consciousness. (*Id.* at 486). While he reported that Plaintiff has several seizures per month, he did not provide the dates of her three most recent episodes. (*Id.*). He stated that Plaintiff does not have any prior warnings of impending seizures and cannot always take safety precautions when she feels one coming on.

(*Id.*). Postictal manifestations include confusion and exhaustion lasting for hours. (*Id.* at 487). Dr. Burnstine opined that Plaintiff could not hold a job and that seizures are adding stress to her life. (*Id.*). He stated that Plaintiff suffers side effects from her seizure medications, including dizziness, lethargy, lack of alertness, and impaired concentration. (*Id.* at 488). He opined that Plaintiff's seizures would likely disrupt the work of co-workers, she would need more supervision than an impaired worker, could not work at heights, with power machines, or operate a motor vehicle. (*Id.*). Dr. Burnstine concluded that Plaintiff would need unscheduled breaks during the workday and was incapable of even low-stress jobs. (*Id.* at 489).

At the February 28, 2011 hearing, Plaintiff testified that both her short-term and long-term memory have declined. (R. at 44–46). She described her brain as a "pasta strainer," catching some things and forgetting others. (*Id.* at 48). She testified that she lost her job as a bank teller because she was coming up short all the time, which she attributed to counting errors caused by her epilepsy. (*Id.* at 81–84).

Plaintiff's father testified that Plaintiff has three to four grand mall seizures a week, plus more frequent pseudoseizures. (R. at 48–51). Plaintiff stated that she gets some warning before her grand mal seizures—she gets shaky, confused, and her speech becomes incoherent. (*Id.* at 53–54). She testified that her seizures are often triggered when she's tired or stressed. (*Id.* at 54–56). Plaintiff's postictal drowsiness lasts four hours, and her body aches along with horrible headaches. (*Id.* at 60).

Plaintiff reported taking Trileptal and Topamax for her epilepsy and Xanax for her anxiety. (R. at 64–65). She does not see Dr. Burnstine on a regular basis. (*Id.* at 65). She did not recall Dr. Burnstine ever checking her blood levels. (*Id.* at 66). Plaintiff acknowledged that she frequently tried to hide her symptoms from Dr. Burnstine because she did not think her seizures were "serious" at first and wanted to get a driver's license. (*Id.* at 68–70).

Plaintiff's father testified that while working as a bank teller, Plaintiff had eight seizures, necessitating calls for an ambulance. (R. at 79). Plaintiff stated that after working at the bank "for a long period of time," she left the job after being wrongly accused of pilfering money from the cash drawer. (*Id.* at 42, 81).

The ME testified that the medical evidence confirms a diagnosis of primary seizure disorder. (R. at 61–62). Plaintiff has no neurological defects; CT scan, MRI, and EEG tests are all normal. (*Id.* at 62–63). The ME testified that Plaintiff was receiving the proper *type* of medications but that the proper protocol would be to monitor her blood levels to make sure the *dosage* levels are effective. (*Id.* at 66–67).

Plaintiff's attorney agreed to follow-up with Dr. Burnstine to determine whether Plaintiff's blood levels were being monitored to confirm that she was within the therapeutic range for controlling her seizures. (R. at 81–91). The ALJ kept the record open for an additional 30 days to secure this information. (*Id.* at 91).

On March 16, 2011, blood tests indicated that Plaintiff's topiramate and oxcarbazepine levels were below the recommended levels for maintaining seizure control. (R. at 508).

On March 21, 2011, Plaintiff took an intentional overdose of Benadryl after getting into an argument with her father. (R. at 503). After examination by a crisis team, they concluded that she was not a threat to herself because she was the one who called 911. (*Id.* at 502). They recommended that she follow-up with her psychologist. (*Id.*). Plaintiff was released to her father and fiancé. (*Id.*).

## V. DISCUSSION

Plaintiff raises three arguments in support of her request to reverse and remand: (1) the medical evidence substantiates giving Dr. Burnstine's opinion greater weight; (2) the ALJ impermissibly rejected Plaintiff's credibility; and (3) the ALJ failed to adequately consider Plaintiff's nonexertional limitations when determining she could perform her previous bank teller occupation. (Mot. 10–15). The Court addresses each argument in turn.

## A. Substantial Evidence Supports Weight Given to Dr. Burnstine's Opinion

Plaintiff contends that Dr. Burnstine's opinion was supported by the medical evidence and should have been afforded great weight. (Mot. 12). Plaintiff argues that "there is ample objective clinical medical evidence in the record to support Dr. Burnstine's opinion and the nature of his treatment, including the opinion of the ME, who indicated Dr. Burnstine's opinion supported a finding that Plaintiff met listing 11.03." (*Id.* 13).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion

of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

On July 23, 2010 and February 11, 2011, Dr. Burnstine completed two separate Seizures RFC Questionnaires. (R. at 429–32, 486–89). He diagnosed generalized tonic clonic seizures with loss of consciousness, occurring several times a month. (*Id.* at 429, 486). Dr. Burnstine opined that Plaintiff could not hold a job and that seizures are adding stress to her life. (*Id.* at 487). He stated that Plaintiff suffers

side effects from her medication, including dizziness, lethargy, lack of alertness, and impaired concentration. (*Id.* at 430, 488). Dr. Burnstine opined that Plaintiff's seizures would likely disrupt the work of co-workers, she would need more supervision than an unimpaired worker, and could not work at heights, with power machines, or operate a motor vehicle. (*Id.*). Dr. Burnstine concluded that Plaintiff would need unscheduled breaks during the workday, was incapable of even low-stress jobs, and would likely miss four days of work per month. (*Id.* at 432, 489).

In his decision, the ALJ rejected Dr. Burnstine's opinion, finding that it was not supported by the medical evidence:

> [The ME] indicated that Dr. Burnstine's assessment is not backed up by scientific information of documented seizure activity. The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled, and the doctor did not specifically address this weakness. There are no treatment records indicating that [Plaintiff] has seizures every month . . . .

(R. at 29) (citation omitted). The ALJ also found that Dr. Burnstine did not perform periodic blood workups to confirm Plaintiff's dosage requirements, as required by Social Security Ruling (SSR) 87-6:[12]

> In addition, there is no blood work from Dr. Burnstine that would indicated whether [Plaintiff] is compliant with seizure medication or if she is taking the right amount. It is unusual that her blood levels are not checked.

---

[12] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

(*Id.*) (citation omitted).

Plaintiff contends that the medical evidence supports Dr. Burnstine's opinion. (Mot. 12–13). On the contrary, the ME found no scientific evidence of documented seizure activity, especially after Plaintiff's alleged onset date of November 1, 2008, and prior to June 30, 2010, her date last insured. (R. at 62–64; *accord id.* at 29). On November 2, 2006, Plaintiff complained of seizure activity, but the emergency room physician found it "questionable." (*Id.* at 358). Plaintiff was "perfectly oriented" and a neurological examination was unremarkable. (*Id.* at 359). Subsequent emergency room visits also found no neurological deficits. (*Id.* at 437 (December 2008), 330–31 (July 2009), 366 (August 2009), 371–72 (September 2009), 401 (Dr. Burnstine opined that a November 2009 emergency room visit because of a fall was the result of a panic attack, not a seizure.)). In fact, the only emergency room visit documenting objective seizure activity occurred in August 2010. (*Id.* at 478–81). In the examination room, Plaintiff did not know her name or other personal information. (*Id.*). On examination, her level of consciousness was altered; she was disoriented to person, place, and time. (*Id.* at 481). Seizure activity was noted, less than 30 seconds in duration, with minimal postictal somnolence but continued confusion. (*Id.*). Nevertheless, the attending physician noted a history of pseudoseizures. (*Id.* at 478). In August 2009, a physical examination by the consultative examiner was unremarkable; Plaintiff's immediate and remote memory were intact, and her recent memory good. (*Id.* at 305–06). A November 2009 CT scan of Plaintiff's brain was normal. (*Id.* at 381). (*Id.* at 401). A December 2009 MRI of Plaintiff's brain and an 18-channel

EEG with one added channel of EKG rhythm activity were normal. (*Id.* at 399–400). On February 17, 2010, Dr. Burnstine opined that Plaintiff could safely operate a motor vehicle, stating that her seizure disorder was successfully controlled with medications. (*Id.* at 397–98).

Plaintiff argues that her seizures were documented by EEG results. (Mot. 13). But the EEG test result cited by Plaintiff was from May 2004 (R. at 294), more than four years prior to her alleged onset date. Plaintiff also contends the ME testified that Dr. Burnstine's opinion supported a finding that Plaintiff met listing 11.03. (Mot. 13). Plaintiff misapprehends the ME's testimony. The ME opined that Plaintiff meets the criteria of listing 11.02A *only* if the ALJ accepted Dr. Burnstine's unsupported opinion that Plaintiff has several seizures every month. (R. at 63). As demonstrated above, the scientific evidence does not support this assertion.

Plaintiff also argues that Dr. Burnstine altered Plaintiff's medication regimen on multiple occasions in an attempt to control her seizures, yet they continued to breakthrough. (Mot. 13). However, while Dr. Burnstine altered Plaintiff's medications on several occasions in 2004, there is no evidence that he made any subsequent changes to her dosages. (R. at 296–97, 291–92, 289–90, 288).

The Commissioner has concluded that with appropriate medications, epileptic seizures are controllable and most epileptics are able to engage in substantial gainful activity:

> Potent anticonvulsants are available and reliable methods to determine blood anticonvulsant levels have been developed. This has made possible the more precise "tailoring" of anticonvulsant drugs to the patient's needs. Due to these advances, most epileptic seizures are con-

trollable and individuals who receive appropriate treatment are able to work.

SSR 87-6, at *1. Further, the treating physician must have an ongoing, regular relationship with the claimant, especially when the treatment regimen is ineffective. *Id.* at *2. Here, there were significant gaps in Plaintiff's treatments with Dr. Burnstine. For example, there are no records of any visits between November 2006 and October 2009, and in July 2009, Dr. Burnstine informed the Commissioner that he had not seen Plaintiff in over a year. (R. at 285–99, 320, 396–404). Nor is there any consistent record of Plaintiff following up with Dr. Burnstine after her alleged seizures sent her to the emergency room. *See* SSR 87-6, at *2 ("There must be a satisfactory description by the treating physician of the treatment regimen and response, in addition to corroboration of the nature and frequency of seizures, to permit an informed judgment on impairment severity.").

The rules also require periodic testing of anticonvulsant blood levels to confirm that the claimant is taking her medications and that the dosage level is appropriate:

> In every instance, the record of anticonvulsant blood levels is required before a claim can be allowed. When the treating source indicates that frequent seizures are occurring (or continuing to occur) despite anticonvulsant therapy, detailed information is necessary to establish whether the seizures are due to factors beyond the individual's control or to noncompliance with prescribed therapy. . . .

> The predominant reason for low anticonvulsant blood levels is that the individual is not taking the drugs as prescribed. In extremely rare cases, individual idiosyncrasy in absorption or metabolism of the drug causes therapeutically inadequate anticonvulsant blood levels. The reasons for abnormal absorption or metabolism of these drugs is linked to the individual's clinical condition and would have to be recognized by the treating physician in his or her efforts to obtain control of the seizures. . . .

> When reported blood drug levels are low, therefore, the information ob-
> tained from the treating physician should include an explanation as to
> why the levels are low and the results of any relevant diagnostic stud-
> ies concerning the blood levels. Unless convincing evidence is provided
> that subtherapeutic blood drug levels are due to abnormal absorption
> or metabolism, and the prescribed drug dosage is not itself inadequate,
> the conclusion should follow that the individual is not complying with
> the treatment regimen.

SSR 87-6, at *2–3. As the ME affirmed, it is standard protocol for the treating phy-
sician to periodically monitor blood levels, especially where there are ongoing sei-
zure complaints. (R. at 66–67, 86–87, 90–91).

Plaintiff contends that blood results "show Plaintiff was taking her medication."
(Mot. 13). But this was a single test in August 2009 and was ordered by the Com-
missioner, not Dr. Burnstine. (R. at 308, 314, 320). And, "in cases in which there is
convincing evidence of intermittent noncompliance, including seizure activity be-
cause of alcohol abuse, little weight should be given to sporadically obtained anti-
convulsant blood levels, even if they are in the therapeutic range." SSR 87-6, at *3.
Plaintiff testified that she could not recall Dr. Burnstine ever checking her blood
levels. (R. at 66). At the hearing, Plaintiff's counsel acknowledged that Dr. Burn-
stine should be performing periodic diagnostic testing to find a medication regimen
that could control Plaintiff's seizures. (*Id.* at 87–91). The ALJ agreed to hold the
record open for an additional 30 days to ascertain from Dr. Burnstine why there
were no anticonvulsant blood level tests in his records. (*Id.* at 91–92). However, the
only record added was a March 2011 blood test indicating that Plaintiff's topiramate
and oxcarbazepine levels were below the recommended levels for maintaining sei-
zure control. (*Id.* at 508).

In sum, the ALJ provided sound reasons, supported by substantial evidence, for rejecting Dr. Burnstine's opinion. The medical evidence does not support the frequency or intensity of seizures reported. And Dr. Burnstine was not performing periodic blood tests to confirm whether Plaintiff was compliant with her medications or if she was taking the appropriate dosage. SSR 87-6.

## B. Substantial Evidence Supports ALJ's Credibility Determination

Plaintiff contends that the ALJ erred in discounting her testimony about the nature and extent of her ailments. (Mot. 14–15). She asserts that the ALJ mischaracterized and ignored relevant medical evidence. (*Id.*). She also contends that her ability to perform basic needs and routine chores does not undermine her credibility. (*Id.* 15).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(b). "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, at *2; *see*

20 C.F.R. § 404.1529(c). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. "[W]hen a credibility finding rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors, [the Court has] greater leeway to evaluate the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, No. 13-1525, 2014 WL 104158, at *4 (7th Cir. Jan. 13, 2014).

At the hearing, Plaintiff testified that both her short-term and long-term memory has declined. (R. at 44–46). She described her brain as a "pasta strainer," catching some things and forgetting others. (*Id.* at 48). She testified that she lost her job as a bank teller because she was coming up short all the time, which she attributed to counting errors caused by her epilepsy. (*Id.* at 81–84). Plaintiff acknowledged not seeing Dr. Burnstine on a regular basis and did not recall Dr. Burnstine ever checking her blood levels. (*Id.* at 65–66).

The ALJ found Plaintiff not fully credible to the extreme limitations that she described:

> [Plaintiff] has not generally received the type of medical treatment one
> would expect for a totally disabled individual. [Plaintiff] testified and
> treatment records reveal that she does not see Dr. Burnstine on a regu-
> lar basis. There is some indication in the record that [Plaintiff] has not

been compliant with seizure medication. . . . Although [Plaintiff] alleges that she is anxious she has not sought counseling for an anxiety disorder. [Plaintiff] alleges that her memory is poor, yet a consulting psychologist reported that [Plaintiff's] memory skills were intact and her delayed memory was just slightly impaired. . . . Adaptively, [Plaintiff] is able to care for her basic needs and she can perform routine daily chores. The record reveals that [Plaintiff] has had seizures since age fourteen. The fact that the impairment did not prevent [Plaintiff] from working in the past strongly suggests that it would not prevent work. There is evidence that [Plaintiff] stopped working for reasons not related to the allegedly disabling impairment. The record indicates that [Plaintiff] did not leave her bank teller job because of seizures. She left this job because she was wrongly accused of theft of bank funds.

\*   \*   \*

[Plaintiff's] seizures should be controlled if she is taking the right medications in the right amounts, following instructions and refrains from drugs and alcohol. Blood levels should be taken every three months, especially in a case where [Plaintiff] is telling her doctors she keeps having seizures. Blood levels are a routine part of treatment. If [Plaintiff] is taking the improper dosage she will keep having seizures. [Plaintiff] has failed to establish that she is on the proper treatment regimen as ongoing blood levels have not been provided and [Plaintiff] has failed to establish that she has ongoing treatment at consistent levels.

(R. at 28, 29).

Plaintiff contends that "there is no causal link between [her] isolated incidents of noncompliance and her seizures; the ALJ is simply nitpicking the record rather than considering it as a whole." (Mot. 14). As discussed above, substantial evidence supports the ALJ's conclusion that Plaintiff did not see her treating physician on a regular basis and did not have periodic blood tests to determine whether she was consistently taking the right medications in the right amounts. *See* SSR 87-6, at \*1 (precise "tailoring" of anticonvulsant drugs are able to control most epileptic seizures and individuals who receive appropriate treatment are able to work). Further,

her incidents of noncompliance were more than "isolated." On July 15, 2009, Dr. Burnstine informed the Commissioner that he had not seen Plaintiff in over a year and she had not been refilling her prescriptions. (R. at 320). In August 2009, Plaintiff admitted drinking in excess the prior night and may have missed her dosage. (*Id.* at 365); *see* SSR 87-6, at *1 ("In a substantial number of cases, use of alcohol has been found to be a contributory basis for the individual's failure to properly follow prescribed treatment."). Plaintiff admitted in November 2009 and July 2010 that she was noncompliant, and did not even know her dosage levels. (*Id.* at 377, 439, 455). In July 2010, she also reported taking her medications only once a day, which would not be sufficient to control seizures. (*Id.* at 434). A March 2011 blood test confirmed that Plaintiff's topiramate and oxcarbazepine levels were below the recommended levels for maintaining seizure control. (*Id.* at 508). "Noncompliance is usually manifested by failure to continue ongoing medical care and to take medication at the prescribed dosage and frequency." SSR 87-6, at *1.

Plaintiff also challenges the ALJ's finding that Plaintiff's ability to care for her basic needs and perform routine daily chores undermine her credibility. (Mot. 15). Plaintiff argues that her ability to perform routine chores and care for basic needs does not equate to an ability to work. (*Id.*). The Court is mindful that the Seventh Circuit has repeatedly cautioned against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the work-

ing environment as well, often differ dramatically between home and office or factory or other place of paid work."). Thus, while it is proper for an ALJ to consider daily activities, the ALJ "must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Here, the ALJ did not merely rely on Plaintiff's ability to perform routine chores, but relied on the consulting psychologist's examination which undermined Plaintiff's credibility. (R. at 28). The consulting psychologist found Plaintiff's memory skills were "intact"; her memory for recent as well as more distant recall was "appropriate." (R. at 406, 408). Although Plaintiff's delayed memory was *slightly* impaired, the consulting psychologist concluded that Plaintiff was able to take care of her basic needs and perform routine household chores. (*Id.* at 408). Based on this evidence, the ALJ properly concluded that Plaintiff's claim of significant memory loss was not credible.

Finally, Plaintiff argues that the ALJ erroneously found that she did not leave her bank teller job because of seizures. (Mot. 11–12). She contends that she "was fired from her bank teller job because her memory and concentration deficits prevented her from maintaining an accurate count." (*Id.* 11). Plaintiff truncates the ALJ's reasoning. The ALJ found that because Plaintiff had worked as a bank teller subsequent to being treated for epilepsy, it undermined Plaintiff's assertion that she could no longer work. (R. at 28). Plaintiff herself testified that she held the bank teller position "for a long period of time" (*id.* at 42), which undermines her assertion

that her seizures prevented her from maintaining an accurate count. Further, the consulting psychologist found Plaintiff capable of performing arithmetical calculations and concluded that she was able to use judgment and reasoning skills. (*Id.* at 406, 408). Thus, substantial evidence supports the ALJ's conclusion that Plaintiff stopped working as a bank teller not because of seizures, but because she was wrongly accused of theft of funds.

In sum, the ALJ concluded that, when viewed together, Plaintiff's gaps in treatment, noncompliance with medications, ability to work previously, and her daily activities undermined Plaintiff's credibility when describing her disability. "These are exactly the type of factors the ALJ was required to consider." *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). The ALJ provided specific reasons for his credibility finding, supported by substantial evidence. *Moss*, 555 F.3d at 561; *Steele*, 290 F.3d at 942. The ALJ built a logical bridge between the entire case record—including the medical evidence, Plaintiff's statements, and other relevant evidence—and his conclusion. *Schideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Arnold*, 473 F.3d at 823; SSR 96-7p.

## C. Substantial Evidence Supports ALJ's RFC Determination

The ALJ determined that through Plaintiff's DLI of June 30, 2010, her seizure disorder was a severe impairment. (R. at 25). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ

found that Plaintiff had the RFC to perform light work,[13] except she should not be exposed to hazards like dangerous moving machinery or unprotected heights. (*Id.* at 26). Plaintiff argues that the ALJ erred in this determination by failing to include limitations for her difficulties with memory and the adverse effects of her medication. (Mot. 10–12). She contends that the ALJ should have credited her testimony of long- and short-term memory losses and feeling "comatose" from her medication. (*Id.* 10). She argues that her complaints were supported by Dr. Burnstine's opinions, which indicated that Plaintiff's medications caused dizziness, lethargy, impaired concentration, and a lack of alertness. (*Id.*).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise

---

[13] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence, including physicians' opinions and Plaintiff's testimony. As discussed above, substantial evidence supports the ALJ's rejections of Dr. Burnstine's opinion and Plaintiff's credibility. Moreover, while Dr. Burnstine stated in his Seizures RFC Questionnaires that Plaintiff suffers various side effects from her seizure medications, there is only *one* mention of side effects in the medical records. (R. at 404) (Plaintiff reporting in October 2009 that her medications make her "drowsy").

Plaintiff contends that the ALJ failed to consider that Plaintiff's complaints of poor memory and adverse side effects were supported by the consulting psychologist's opinion. (Mot. 10). While Dr. Rudolph did find that Plaintiff's delayed memory was *slightly* impaired, he also opined that Plaintiff's memory skills were intact; her memory for recent as well as more distant recall was appropriate. (R. at 406, 408). Plaintiff also references Dr. Rudolph's finding that Plaintiff presented with "vegetative symptoms" (*id.* at 406), to support that she suffers from adverse side effects

from her medications (Mot. 10). However, it is unclear what Dr. Rudolph meant by "vegetative symptoms," and he did not explicitly mention that Plaintiff had any adverse side effects from her medications. (R. at 406, 407–08). Further, on examination Dr. Rudolph concluded that Plaintiff's knowledge of information was adequate, she could perform mathematical calculations, and she was able to use judgment and reasoning skills. (*Id.* at 406, 408). He also found that Plaintiff was oriented to reality, could take care of her basic needs, and could perform routine daily chores. (*Id.*). Moreover, Plaintiff had "no difficulty understanding what was said to her" and had no need "to have questions repeated or clarified." (*Id.* at 407). Thus, when Dr. Rudolph's opinion is assessed in its entirety, it does not support Plaintiff's claims of significant memory lapses or adverse side effects from medication.

In sum, the Court finds that the ALJ did not err in his determination of Plaintiff's RFC. The ALJ fulfilled his responsibility to determine Plaintiff's RFC after weighing the medical source statements and other evidence in the record. *See* SSR 96-5p, at *2 (the determination of an individual's RFC is not a medical issue; instead, it is an administrative finding dispositive of a case), *5 (The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, . . . an individual's own statement of what he or she is able or unable to do, and many other factors that could help the [ALJ] determine the most reasonable findings in light of all the evidence."). Substantial evidence supports the ALJ's determination that Plaintiff can perform a limited range of light work.

## V. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is **AFFIRMED**.

E N T E R:

Dated: February 19, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge